UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. _____

| | |
|---|---|
| MICHAEL GUTIERREZ As Natural Parent and Legal Guardian of a Minor Child Whose Initials Are D.G., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INDEPENDENT LIVING SYSTEMS, LLC,<br><br>Defendants. | CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Michael Gutierrez, as natural parent and legal guardian of a minor child whose initials are D.G. ("Plaintiff"), brings this Class Action Complaint ("Complaint") against Defendant Independent Living Systems, LLC ("ILS" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.      This class action arises out of the recent data breach ("Data Breach") involving Defendant, a Florida-based company that "offers a comprehensive range of turnkey payer services

including clinical and third-party administrative services to" healthcare providers and organizations.[1]

2.      Plaintiff brings this Complaint against Defendant for its failure to properly secure and safeguard the sensitive and confidential information that it collected and maintained as part of its regular business practices, including, but not limited to, names, date of birth ("personally identifying information" or "PII"), and medical and health insurance information("protected health information" or "PHI" and, collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

3.      The healthcare-specific data compromised is PHI as defined by HIPAA.

4.      Upon information and belief, former and current ILS patients are required to entrust Defendant with sensitive, non-public Private Information, without which Defendant could not perform its regular business activities, in order to obtain medical services from Defendant. Defendant retains this information for at least many years and even after the consumer relationship has ended.

5.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

6.      On July 5, 2022, Defendant "experienced an incident involving the inaccessibility of certain computer systems on our network."[2] Defendant subsequently "began an investigation

---

[1]    Independent Living Systems, *About Us*, https://ilshealth.com/about-ils/ (last visited Mar. 20, 2023).

[2]    A copy of the Notice of Data Incident letter ("Notice Letter") is available at Office of the Maine Attorney                  General,                  *Data                  Breach                  Notifications*,

with the assistance of outside cybersecurity specialists," and as a result of this investigation, Defendant concluded that "an unauthorized actor obtained access to certain ILS systems between June 30 and July 5, 2022" and acquired "some information stored on the ILS network[.]"[3]

7.      Defendant's investigation concluded that the Private Information compromised in the Data Breach included Plaintiff's and approximately 4,200,000 other individuals' information.[4]

8.      Defendant failed to adequately protect Plaintiff's and Class members' Private Information – and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect patients' sensitive data. Hackers targeted and obtained Plaintiff's and Class members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.      Notably, while Defendant may have ultimately disclosed the Data Breach to Plaintiff and Class members, it did so still failing to disclose the date on which it discovered the Data Breach. Indeed, Defendant waited ***more than eight months*** after the Data Breach's occurrence (from July 5, 2022 to March 14, 2023) to notify Plaintiff and Class members of the Data Breach and inform them that their Private Information was compromised. During this time, Plaintiff and Class members were unaware that their sensitive Private Information had been

---

https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last visited Mar. 20, 2023).

[3]     *Id.*

[4]     *Id.*

compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

10.    In breaching its duties to properly safeguard patients' Private Information and give patients timely, adequate notice of the Data Breach's occurrence, Defendant's conduct amounts to negligence and/or recklessness and violates federal and state statutes.

11.    Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (a) adequately protect the Private Information of Plaintiff and Class members; (b) warn Plaintiff and Class members of Defendant's inadequate information security practices; and (c) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

12.    Defendant disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

13.    Plaintiff and Class members have suffered injury as a result of Defendant's conduct. These injuries include: (a) invasion of privacy; (b) lost or diminished value of Private Information;

4876-5641-2250.v1

(c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse and (ii) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

14.     Plaintiff and Class members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

***Plaintiff Michael Gutierrez, as legal guardian of a minor child whose initials are D.G.***

15.     Plaintiff and his minor child D.G. are now, and have at all relevant times been, residents and citizens of California, currently residing in Murriata, California. Plaintiff, on behalf of his minor child D.G., received the Notice Letter, via U.S. mail, directly from Defendant, dated March 14, 2023.

16.     Plaintiff provided D.G.'s Private Information, indirectly or directly, to Defendant on the condition that it be maintained as confidential and with the understanding that Defendant would employ reasonable safeguards to protect D.G.'s Private Information.

17.     If Plaintiff had known that Defendant would not adequately protect D.G.'s Private Information, he would not have allowed Defendant to maintain this sensitive Private Information.

*Defendant Independent Living Systems, LLC*

18.     Defendant ILS is a Florida-based company with its principal place of business located at 4601 NW 77th Avenue, Miami, Florida 33166.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.[5]

20.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District. Defendant has sufficient contacts in Florida, as it conducts a significant amount of its business in the State of Florida.

21.     Venue is proper under 18 U.S.C §1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL BACKGROUND

*Defendant's Business*

22.     ILS is a Florida-based company that "offers a comprehensive range of turnkey payer services including clinical and third-party administrative services to" healthcare providers and organizations.[6]

---

[5]     According to the report submitted to the Office of the Maine Attorney General, 238 Maine residents were impacted. *See* Maine Att'y Gen., *supra* note 2.

[6]     Independent Living Systems, *supra* note 1.

23.     Plaintiff and Class members are current or former patients at Defendant who obtained medical service(s) at one of Defendant's facilities.

24.     In order to obtain medical services from Defendant, Plaintiff and Class members were required to provide sensitive and confidential Private Information, including their names, dates of birth, health information, insurance information, and other sensitive information.

25.     The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class members.

26.     Upon information and belief, Defendant made promises and representations to its patients, including Plaintiff and Class members, that the Private Information collected from them as a condition of receiving medical services would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

27.     Indeed, Defendant's Privacy Policy provides that: "[w]e are required by law to maintain the privacy and security of your protected health information. We implement a variety of security measures to maintain the safety of your personal information when you access your personal information."[7]

28.     Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

29.     Plaintiff and Class members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class members relied on the

---

[7]     Independent Living Systems, *Privacy Policy*, https://ilshealth.com/privacy-policy/ (last visited Mar. 20, 2023).

sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

30.     Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's Private Information safe and confidential.

31.     Defendant had obligations created by the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §45, HIPAA, contract, industry standards, and representations made to Plaintiff and Class members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

32.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class members' Private Information. Without the required submission of Private Information, Defendant could not perform the medical services it provides.

33.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' Private Information from disclosure.

### The Data Breach

34.     On or about March 14, 2023, Defendant began sending Plaintiff and other victims of the Data Breach the Notice Letter, informing them that:

> **What Happened?** On July 5, 2022, we experienced an incident involving the inaccessibility of certain computer systems on our network. We responded to the incident immediately and began an investigation with the assistance of outside cybersecurity specialists. Through our response efforts, we learned that an

- 8 -

unauthorized actor obtained access to certain ILS systems between June 30 and July 5, 2022. During that period, some information stored on the ILS network was acquired by the unauthorized actor, and other information was accessible and potentially viewed. Upon containing the incident and reconnecting our computer systems, we began to review the potentially affected data to determine whether it contained any personal information or PHI, and if so, to whom such information related.

**What Information Was Involved?** As previewed above, we conducted a comprehensive data review exercise to understand the scope of potentially affected information and identify the individuals to whom such information relates. On January 17, 2023, we received the results of this review and determined that the following types of information related to you were included in one or more files acquired by the unauthorized actor or present in one or more files that resided on an area of the ILS network that was accessed by the unauthorized actor: name, date of birth, Medicare identification, Medicaid identification, Food Delivery Information, and other health insurance information.

35.     Omitted from the Notice Letter were the date that Defendant discovered the Data Breach, details of the root cause of the Data Breach, the vulnerabilities exploited, why it took ***over eight months*** to inform impacted individuals after the Data Breach's occurrence, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class members, who retain a vested interest in ensuring that their Private Information remains protected.

36.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class members of the Data Breach's critical facts. Without these details, Plaintiff's and Class members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

37.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

38.     The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiff and Class members, including their names, date of birth, health information, and health insurance information. Plaintiff's and Class members' Private Information was accessed and stolen in the Data Breach.

39.     Plaintiff further believes his Private Information, and that of Class members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

***Healthcare Data Breaches***

40.     Healthcare companies are well recognized targets for hackers and data thieves due to the volume and sensitivity of the Private Information they collect and maintain.

41.     Therefore, Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry, prior to Defendant's Data Breach, and Defendant's failures to adequately design, implement and monitor systems to protect the Private Information.

42.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.  Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry. The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly ten million sensitive records (9,700,238) in 2020.

43.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in 2019 alone.

44.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March

2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

45.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."

46.     Additionally, as companies became more dependent on computer systems to run their business,[8] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things, the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[9]

47.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including ILS. Moreover, it was well aware of not only the risk that it would be targeted by cybercriminals but also of the

---

[8]     Board of Governors of the Federal Reserve System, *FEDS Notes* (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[9]     Dr. Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, Picus (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

severe and persistent harm that would result to its patients if it failed to protect against future attacks. Upon information and belief, the threat actors specifically targeted ILS with the criminal intent to acquire and steal private and confidential data for subsequent sale on the Dark Web and to commit future identity theft crimes.

***Data Breaches Are Preventable***

48.     As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[10]

49.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[10]     *See* How to Protect Your Networks from RANSOMWARE, at 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Mar. 21, 2023).

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls – including file, directory, and network share permissions – with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[11]

50.     To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be

---

[11]   *Id.* at 3-4.

4876-5641-2250.v1

someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters – and keep them updated – to reduce malicious network traffic….[12]

51.     To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-       Apply latest security updates

---

[12]  *See* Cybersecurity & Infrastructure Security Agency, *Protecting Against Ransomware* (original release date Apr. 11, 2019 revised Sept. 2, 2021), https://us-cert.cisa.gov/ncas/tips/ST19-001.

-     Use threat and vulnerability management
-     Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-     Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-     Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-     Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-     Monitor for adversarial activities
-     Hunt for brute force attempts
-     Monitor for cleanup of Event Logs
-     Analyze logon events;

**Harden infrastructure**

-     Use Windows Defender Firewall
-     Enable tamper protection
-     Enable cloud-delivered protection
-     Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[13]

     52.    Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information.

---

[13] *See* Microsoft Security, *Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020),    https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

53.     Given that Defendant was storing the sensitive Private Information of its current and former patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

54.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of over 4,200,000 patients, including that of Plaintiff's and Class members'.

***Defendant Acquires, Collects, and Stores Plaintiff's and the Class' Private Information***

55.     As a condition to obtain medical services from Defendant, Plaintiff and Class members were required to give their sensitive and confidential Private Information to Defendant.

56.     Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class members' Private Information, Defendant would be unable to perform its medical services.

57.     By obtaining, collecting, and storing the Private Information of Plaintiff and Class members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

58.     Plaintiff and Class members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

59.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class members.

- 16 -

60.     Upon information and belief, Defendant made promises to Plaintiff and Class members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

61.     Indeed, Defendant's Privacy Policy provides that: "[w]e are required by law to maintain the privacy and security of your protected health information. We implement a variety of security measures to maintain the safety of your personal information when you access your personal information."[14]

62.     Defendant's negligence in safeguarding the Private Information of Plaintiff and Class members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

***Defendant Knew or Should Have Known of the Risk Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable to Cyber Attacks***

63.     Data thieves regularly target healthcare entities like Defendant's due to the highly sensitive information that they retain custody of. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

64.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information and other sensitive information, like Defendant, preceding the date of the Data Breach.

65.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June

---

[14]    Independent Living Systems, *supra* note 7.

2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

66.     As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class members as a result of a breach.

67.     Defendant's Privacy Policy evidences its knowledge of the foreseeable risks of Data Breaches, like the one it experienced, stating: "[w]e will promptly notify you if a breach occurs that may have compromised the privacy or security of your information."[15]

68.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[16] Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[17]

69.     The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly ten million sensitive records (9,700,238) in 2020.[18]

---

[15]  *Id*.

[16]  *See* Identity Theft Resource Center, *2021 Data Breach Report*, at 6 (Jan. 2022), https://www.idtheftcenter.org/wp-content/uploads/2022/04/ITRC_2021_Data_Breach_Report.pdf.

[17]  *Id*.

[18]  *Id*.

4876-5641-2250.v1

70.     Entities in custody of PHI and/or medical information reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[19] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[20] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impacts the economy as a whole.[21]

71.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class members from being compromised.

72.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class members as a result of a breach.

---

[19]   *See* Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last visited Mar. 21, 2023).

[20]   *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[21]   *See id.*

73.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially *millions* of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

74.     In the Notice Letter, Defendant makes an offer to provide credit and identity monitoring services for a period of no longer than 24 months to Class members. This is wholly inadequate to compensate Plaintiff and Class members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class members' Private Information. Moreover, once this service expires, Plaintiff and Class members will be forced to pay out of pocket for necessary identity monitoring services.

75.     Defendant's offering of credit and identity monitoring establishes that Plaintiff's and Class members' sensitive Private Information *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems. Moreover, Defendant's offer indicates that it recognizes that Plaintiff and Class members are at a present and continuing risk of identity theft and fraud as a result of the Data Breach.

76.     The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class members.

77.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class members are long lasting and severe. Once Private Information is stolen –

- 20 -

particularly Social Security numbers – fraudulent use of that information and damage to victims may continue for years.

78.     As a healthcare entity in possession of its patients' and former patients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

***The Value of PII and PHI***

79.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

80.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web

---

[22]  17 C.F.R. §248.201 (2013).

[23]  *Id.*

pricing for stolen identity credentials.[24] For example, Private Information can be sold at a price ranging from $40 to $200.[25] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[26]

81.     Theft of PHI is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

82.     According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[27]

83.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change – Social Security number and name.

---

[24]   Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[25]   Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[26]   *In the Dark – Dark Web Report*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Mar. 21, 2023).

[27]   Lisa Vaas, *Ransomware attacks paralyze, and sometimes crush, hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

84.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[28]

85.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

86.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[29]

87.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[28]   Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, Network World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[29]   *Report to Congressional Requesters, PERSONAL INFORMATION Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

- 23 -

***Defendant Fails to Comply with FTC Guidelines***

88.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

89.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[30]

90.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[31]

91.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[30] *Protecting Personal Information: A Guide for Business*, FTC (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[31] *Id.*

- 24 -

92.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

93.     These FTC enforcement actions include actions against healthcare entities, like Defendant. *See, e.g.*, *In re LabMD, Inc., a corp.*, No. 9357, 2016 WL 4128215, at *32 (FTC July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the [FTCA].").

94.     Section 5 of the FTCA, 15 U.S.C. §45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

95.     Defendant failed to properly implement basic data security practices.

96.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.

97.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its patients, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it

obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

***Defendant Fails to Comply with HIPAA Guidelines***

98.     Defendant is a covered business associate under HIPAA (45 C.F.R. §160.102) and is required to comply with the HIPAA Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule") and Standards for Privacy of Individually Identifiable Health Information ("Security Rule"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C.

99.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[32] *See* 42 U.S.C. §17921; 45 C.F.R. §160.103.

100.     HIPAA's Privacy Rule establishes national standards for the protection of health information.

101.     HIPAA's Privacy Rule establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

102.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. §164.302.

103.     "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. §160.103.

---

[32]   HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

104. HIPAA's Security Rule requires Defendant to do the following:

(a) Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

(b) Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

(c) Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

(d) Ensure compliance by its workforce.

105. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. §164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

106. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. §164.306(a)(1) and (3); *see also* 42 U.S.C. §17902.

107.     The HIPAA Breach Notification Rule, 45 C.F.R. §§164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of a breach. . . .*"[33] (Emphasis added).

108.     HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. §164.530(e).

109.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. §164.530(f).

110.     HIPAA also requires the Office of Civil Rights ("OCR"), within the U.S. Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§164.302-318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[34] The list of resources includes a link to guidelines set by the

---

[33] *Breach Notification Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Mar. 21, 2023).

[34] *Security Rule Guidance Material*, U.S. Dep't of Health & Human Services, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Mar. 21, 2023).

National Institute of Standards and Technology ("NIST"), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[35]

***Defendant Fails to Comply with Industry Standards***

111.   As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

112.   Several best practices have been identified that, at a minimum, should be implemented by healthcare and healthcare-support entities in possession of Private Information, like Defendant, including, but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

113.   Other best cybersecurity practices that are standard in the healthcare and healthcare-support industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

---

[35] *Guidance on Risk Analysis*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Mar. 21, 2023).

114.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including, without limitation, PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

115.    These foregoing frameworks are existing and applicable industry standards in the healthcare and healthcare-support industry, and upon information and belief, Defendant failed to comply with at least one – or all – of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Defendant owed Plaintiff and Class Members a Duty to Safeguard their PII and PHI***

In addition to its obligations under federal and state laws, Defendant owed a duty

116.    to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class members.

117.    Defendant owed a duty to Plaintiff and Class members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

118.    Defendant owed a duty to Plaintiff and Class members to implement processes that would detect a compromise of Private Information in a timely manner.

119.    Defendant owed a duty to Plaintiff and Class members to act upon data security warnings and alerts in a timely fashion.

120.    Defendant owed a duty to Plaintiff and Class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

121.    Defendant owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any inadequate data security practices.

***Common Injuries and Damages***

122.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class members has materialized and is imminent, and Plaintiff and Class members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) lost or diminished value of Private Information; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse and (ii) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

***The Data Breach Increases Plaintiff's and Class members' Risk of Identity Theft***

123.    The unencrypted Private Information of Plaintiff and Class members will end up for sale on the dark web as that is the *modus operandi* of hackers.

124.     Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class members.

125.     Simply, unauthorized individuals can easily access the Private Information of Plaintiff and Class members.

126.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

127.     Plaintiff's and Class members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class members and to profit off their misfortune.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

128.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

129.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class members must, as Defendant's Notice Letter instructs them, "remain vigilant"[36] and monitor their financial accounts for many years to mitigate the risk of identity theft.

130.    Plaintiff and Class members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

131.    Plaintiff's mitigation efforts are consistent with the GAO that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[37]

132.    Plaintiff's mitigation efforts are also consistent with the steps that the FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[38]

133.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[39]

---

[36]    Notice Letter, *supra* note 2.

[37]    *See* GAO Report, *supra* note 29.

[38]    *See* FTC, *Identity Theft.gov*, What To Do Right Away, https://www.identitytheft.gov/Steps (last visited Mar. 21, 2023).

[39]    Jason Steele, *Credit card fraud and ID theft statistics*, creditcards.com (June 11, 2011), https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/.



134.    And for those Class members who experience actual identity theft and fraud, the GAO released the GAO Report in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

***Diminution of Value of PII and PHI***

135.    PII and PHI are valuable property rights.[40] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII and PHI have considerable market value.

---

40    *See* GAO Report, *supra* note 29.

136.     Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[41]

137.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[42] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[43,44] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.

138.     As a result of the Data Breach, Plaintiff's and Class members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

---

[41]   *See, e.g.*, John T. Soma, *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, XV Rich. J.L. & Tech. 11, at 2 (2009), http://law.richmond.edu/jolt/v15i4/article11.pdf. ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[42]   *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[43]   David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, LA Times (Nov. 5, 2029), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[44]   Datacoup, https://datacoup.com/ (last visited Mar. 29, 2023).

139.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class members as a result of a breach.

140.     The fraudulent activity resulting from the Data Breach may not come to light for years.

141.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

142.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially millions of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

143.     The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class members.

***Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

144.     Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in the Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – *e.g.*, opening bank

accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

145.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or his Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

146.     Consequently, Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future.

147.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Loss of the Benefit of the Bargain***

148.     Furthermore, Defendant's poor data security deprived Plaintiff and Class members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for the provision of medical services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

- 37 -

*Plaintiff's Experience*

149.    Plaintiff's minor child D.G. has obtained comprehensive care management and nutritional support for medical and educational facilities affiliated with Defendant since approximately 2013. In order to obtain medical services from the Defendant-affiliated facilities, Plaintiff was required to provide D.G.'s Private Information, whether directly or indirectly, to Defendant.

150.    Upon information and belief, at the time of the Data Breach – from June 30, 2022 to July 5, 2022 – Defendant retained D.G.'s Private Information in its system.

151.    Plaintiff is very careful about sharing his and D.G.'s sensitive Private Information. Plaintiff stores any documents containing his and D.G.'s Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

152.    Plaintiff received the Notice Letter directed to D.G., by U.S. mail, directly from Defendant, dated March 14, 2023. According to the Notice Letter, D.G.'s PII and PHI was improperly accessed and obtained by unauthorized third parties, including his name, date of birth, treatment information, Food Delivery information, admission date or date of service, health insurance information, and other personal information.

153.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach on D.G., including changing his passwords and resecuring his own computer systems. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and/or recreation. The time spent dealing with the

repercussions of this Data Breach and attempting to mitigate its effects has been lost forever and cannot be recaptured.

154.    Plaintiff suffered actual injury from having D.G.'s Private Information compromised as a result of the Data Breach including, but not limited to: (a) invasion of privacy; (b) lost or diminished value of Private Information; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to D.G.'s Private Information, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse and (ii) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

155.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence, and by the fact that Defendant waited several months to disclose the Data Breach to Plaintiff and Class members. The fear, anxiety, and distress are continuous in Plaintiff's life and are reinforced when Plaintiff is bombarded by spam and phishing emails, targeted advertisements, and intrusive thoughts about what specific information was compromised and in whose hands it is now.

156.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms to D.G. caused by the Data Breach.

157.    As a result of the Data Breach, Plaintiff, on behalf of D.G., is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

4876-5641-2250.v1

158.    Plaintiff has a continuing interest in ensuring that D.G.'s Private Information, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

159.    Pursuant to Federal Rules of Civil Procedure 23(b)(2)-(b)(3), and (c)(4), Plaintiff brings this action on behalf of himself, as legal guardian of D.G., and on behalf of all members of the proposed Class defined as:

> **<u>Nationwide Class:</u>** All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant on or about March 14, 2023 ("Class").

160.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

161.    Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

162.    **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. At least 4,200,000 individuals were notified by Defendant of the Data Breach, according to the breach report submitted to Maine

4876-5641-2250.v1

Attorney General's Office.[45] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them Notice Letters.

163.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

(a)     Whether and to what extent Defendant had a duty to protect the Private Information of D.G. and Class members;

(b)     Whether Defendant had respective duties not to disclose the Private Information of D.G. and Class members to unauthorized third parties;

(c)     Whether Defendant had respective duties not to use the Private Information of D.G. and Class members for non-business purposes;

(d)     Whether Defendant failed to adequately safeguard the Private Information of D.G. and Class members;

(e)     Whether and when Defendant actually learned of the Data Breach;

(f)     Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class members that their Private Information had been compromised;

(g)     Whether Defendant violated the law by failing to promptly notify Plaintiff and Class members that their Private Information had been compromised;

---

[45]   Notice Letter, *supra* note 2.

(h)     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

(i)      Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

(j)      Whether Plaintiff and Class members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

(k)     Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

164.    **Typicality**: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff's minor child D.G., like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

165.    **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

166.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of Class members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class members. Plaintiff seeks no relief that is antagonistic or adverse to Class

members and the infringement of the rights and the damages she has suffered are typical of other Class members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

167.     **Superiority and Manageability**: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

168.     The nature of this action and the nature of laws available to Plaintiff and Class members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

169.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

170.    Adequate notice can be given to Class members directly using information maintained in Defendant's records.

171.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class members, Defendant may continue to refuse to provide proper notification to Class members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

172.    Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

173.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

(a)    Whether Defendant failed to timely notify the Plaintiff and the Class of the Data Breach;

(b)    Whether Defendant owed a legal duty to D.G. and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

(c)    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

(d)     Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

(e)     Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

(f)     Whether adherence to HIPAA and FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I

**Negligence**
**(On Behalf of Plaintiff and the Class)**

174.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 173.

175.    Defendant requires its patients, including D.G. and Class members, to submit non-public Private Information in the ordinary course of providing its medical services.

176.    Defendant gathered and stored the Private Information of D.G. and Class Members as part of its business of soliciting its services to its clients and its clients' patients, which solicitations and services affect commerce.

177.    Plaintiff and Class members entrusted Defendant with their or their minor child's Private Information with the understanding that Defendant would safeguard their information.

178.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that D.G. and Class members could and would suffer if the PII were wrongfully disclosed.

179.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable

- 45 -

means to secure and safeguard their computer property – and Class members' PII held within it – to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

180.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. §45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

181.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. §164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

182.    For instance, HIPAA required Defendant to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendant did not begin to notify Plaintiff or Class members of the Data Breach until March 14, 2023 despite, upon information and belief, Defendant knowing shortly after July 5, 2022 that unauthorized persons had accessed and acquired the private, protected, personal information of D.G. and the Class.

183.    Defendant owed a duty of care to D.G. and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its

- 46 -

systems and networks, and the personnel responsible for them, adequately protected the Private Information.

184.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients. That special relationship arose because D.G. and the Class entrusted Defendant with their confidential Private Information, a necessary part of being patients of Defendant.

185.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

186.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and D.G. or the Class.

187.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former patients' Private Information it was no longer required to retain pursuant to regulations.

188.    Additionally, Defendant had a duty to promptly and adequately notify Plaintiff, on behalf of D.G., and the Class of the Data Breach.

189.    Defendant had and continues to have a duty to adequately disclose that the Private Information of D.G. and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff, on behalf of D.G., and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

190.    Defendant breached its duties, pursuant to the FTCA, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class

- 47 -

members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

(a)     Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

(b)     Failing to adequately monitor the security of their networks and systems;

(c)     Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

(d)     Allowing unauthorized access to Class members' Private Information;

(e)     Failing to detect in a timely manner that Class members' Private Information had been compromised;

(f)     Failing to remove former patients' Private Information it was no longer required to retain pursuant to regulations;

(g)     Failing to timely and adequately notify Class members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

(h)     Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the Data Breach.

191.    Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to D.G. and the Class.

192.    Defendant's violation of Section 5 of the FTCA constitutes negligence.

- 48 -

193. D.G. and the Class are within the class of persons that the FTCA and HIPAA were intended to protect.

194. The harm that occurred as a result of the Data Breach is the type of harm the FTCA and HIPAA were intended to guard against.

195. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by D.G. and the Class.

196. A breach of security, unauthorized access, and resulting injury to D.G. and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

197. It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in both the financial services and medical industry.

198. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that D.G. and the Class could and would suffer if the Private Information were wrongfully disclosed.

199. D.G. and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of D.G. and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

200. It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

201.    Plaintiff, on behalf of D.G., and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

202.    Defendant was in a position to protect against the harm suffered by D.G. and the Class as a result of the Data Breach.

203.    Defendant's duty extended to protecting D.G. and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

204.    Defendant has admitted that the Private Information of D.G. and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

205.    But for Defendant's wrongful and negligent breach of duties owed to D.G. and the Class, the Private Information of D.G. and the Class would not have been compromised.

206.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of D.G. and the Class and the harm, or risk of imminent harm, suffered by D.G. and the Class. The Private Information of D.G. and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

207.    As a direct and proximate result of Defendant's negligence, D.G. and the Class have suffered and will suffer injury, including, but not limited to: (a) invasion of privacy; (b) lost or diminished value of Private Information; (c) lost opportunity costs associated with attempting

to mitigate the actual consequences of the Data Breach, including, but not limited to, lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse and (ii) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

208.    As a direct and proximate result of Defendant's negligence, D.G. and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

209.    Additionally, as a direct and proximate result of Defendant's negligence, D.G. and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

210.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of D.G. and Class members in an unsafe and insecure manner.

211.    D.G. and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

212.    D.G. and Class members are also entitled to injunctive relief requiring Defendant to: (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class members.

- 51 -

COUNT II

**Negligence *Per Se***
**(On behalf of Plaintiff and the Class)**

213.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 173.

214.    Pursuant to the FTCA, 15 U.S.C. §45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard D.G.'s and Class members' Private Information.

215.    Pursuant to HIPAA, 42 U.S.C. §1302d*, et seq*., Defendant had a duty to implement reasonable safeguards to protect D.G.'s and Class members' Private Information.

216.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. §164.304.

217.    Defendant breached its duties to D.G. and Class members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard D.G.'s and Class members' Private Information.

218.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se.*

219.    The injuries to D.G. and Class members resulting from the Data Breach were directly and indirectly caused by Defendant's violation of the statutes described herein.

220.    D.G. and Class members were within the class of persons the FTCA and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

221.    But for Defendant's wrongful and negligent breach of their duties owed to D.G. and Class members, D.G. and Class members would not have been injured.

222.    The injuries and harms suffered by D.G. and Class members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause D.G. and Class members to experience the foreseeable harms associated with the exposure of their Private Information.

223.    As a direct and proximate result of Defendant's negligent conduct, D.G. and Class members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

COUNT III

**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

224.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 173.

225.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of D.G. and Class members.

226.    As such, a portion of the payments made for the benefit of or on behalf of D.G. and Class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

- 53 -

227.     Plaintiff, on behalf of D.G., and Class members conferred a monetary benefit on Defendant. Specifically, they paid for services from Defendant and/or its agents and in so doing also provided Defendant with their Private Information. In exchange, Plaintiff, on behalf of D.G., and Class members should have received from Defendant the services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

228.     Defendant knew that Plaintiff, on behalf of D.G., and Class members conferred a benefit on it in the form of their Private Information as well as payments made on their behalf as a necessary part of their receiving healthcare services. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of D.G. and Class members for business purposes.

229.     Defendant would not be able to carry out an essential function of its regular business without the Private Information of D.G. and Class members and derived revenue by using it for business purposes. Plaintiff, on behalf of D.G., and Class members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

230.     Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure D.G.'s and Class members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of D.G. and Class members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. D.G. and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

231. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained from Plaintiff, on behalf of D.G., and Class members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

232. Defendant failed to secure D.G.'s and Class members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiff, on behalf of D.G., and Class members provided.

233. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

234. If Plaintiff, on behalf of D.G., and Class members knew that Defendant had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendant.

235. D.G. and Class members have no adequate remedy at law.

236. As a direct and proximate result of Defendant's conduct, D.G. and Class members have suffered and will suffer injury, including, but not limited to: (a) invasion of privacy; (b) lost or diminished value of Private Information; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse and (ii) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

237.     As a direct and proximate result of Defendant's conduct, D.G. and Class members have suffered and will continue to suffer other forms of injury and/or harm.

238.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of D.G. and Class members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff, on behalf of D.G., and Class members overpaid for Defendant's services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of D.G. and Class members, requests judgment against Defendant and that the Court grants the following:

A.     For an order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of D.G. and Class members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class members;

C.     For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of D.G. and Class members, including, but not limited to, an order:

(a)     prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

(b)     requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

- 56 -

(c)     requiring Defendant to delete, destroy, and purge the personal identifying information of D.G. and Class members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of D.G. and Class members;

(d)     requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of D.G. and Class members;

(e)     prohibiting Defendant from maintaining the Private Information of D.G. and Class members on a cloud-based database;

(f)     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

(g)     requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

(h)     requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

(i)     requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

(j)     requiring Defendant to conduct regular database scanning and securing checks;

4876-5641-2250.v1

(k)      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of D.G. and Class members;

(l)      requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

(m)      requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

(n)      requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

(o)      requiring Defendant to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

(p)      requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of ten years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide

such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.       For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.       For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.       For prejudgment interest on all amounts awarded; and

G.       Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  March 29, 2023                          Respectfully Submitted,

ROBBINS GELLER RUDMAN
   & DOWD LLP
STUART A. DAVIDSON
FLORIDA BAR NO. 0084824
ALEXANDER A. COHEN
FLORIDA BAR NO. 1002715
ANNY MARIE MARTIN
FLORIDA BAR NO. 1000491


*s/ Stuart A. Davidson*
STUART A. DAVIDSON

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
acohen@rgrdlaw.com
amartin@rgrdlaw.com

- 59 -

EDELSON LECHTZIN LLP
MARC H. EDELSON*
411 South State Street, Suite N-300
Newtown, PA  18940
Telephone:  215/867-2399
267/685-0676 (fax)
medelson@edelson-law.com

*Counsel for Plaintiff and the Putative Class*

\* *Pro hac vice* forthcoming